**CENTENNIAL INSURANCE COMPANY, et al.**

v.

**LUMBERMENS MUTUAL CASUALTY COMPANY.**

Civ. A. No. 86–6064.

United States District Court, E.D. Pennsylvania.

Nov. 17, 1987.

William G. Cilingin, Philadelphia, Pa., for plaintiffs.

T. Andrew Culbert, Timothy C. Russell, Philadelphia, Pa., for defendant.

## MEMORANDUM

NEWCOMER, District Judge.

I have before me the parties' motions[1] for summary judgment in this action for a declaratory judgment. This case involves a dispute over an insurer's duty to defend and indemnify its insured.

### I. Factual Background

The facts that follow are not in dispute.[2] Plaintiff Centennial Insurance Company (Centennial) is an insurance company which is incorporated in the State of New York, and which has its principal place of business in New York, New York. Plaintiff Jordan Chemical Company (Jordan) is a Pennsylvania Corporation with its principal place of business in Folcroft, Pennsylvania. Defendant Lumbermens Mutual Casualty Company (Lumbermens) is an insurance company organized and existing under the laws of the State of Illinois with its principal place of business located in Long Grove, Illinois.

Both Centennial and Lumbermens insured Jordan under comprehensive general liability insurance policies. The policies were very similar in terms but they covered different time periods. Lumbermens insured Jordan from August 15, 1976 to August 15, 1977. Centennial insured Jordan from August 15, 1977 to August 15, 1978.

As a by product of its normal course of business, Jordan generates industrial waste that it generally deposits into the local sewage treatment authority's sewage system. On two separate occasions, in November 1976 and May 1977, the local sewage treatment authority refused to accept Jordan's waste for a short period of time. Jordan contacted a waste hauler known as ABM Disposal Service Company (ABM) and arranged for ABM to dispose of the waste that Jordan had accumulated while it was

---

1. The motions under consideration in this decision consist of the following: Centennial's motion for summary judgment; Lumbermens' first motion for summary judgment; Lumbermens' second motion for summary judgment; Lumbermens' third motion for summary judgment.

2. Defendant Lumbermens argues that plaintiff Centennial cannot rely on depositions taken in the underlying action, *United States v. Melvin R. Wade, et al.*, 653 F.Supp. 11 (E.D.Pa.), because it was not a party to that action and it was not given an opportunity to perform cross-examination personally or through a representative during the deposition. Although this argument appears sound initially, it must be noted that it was Lumbermens' refusal to defend the case that actually prevented its participation in the *Wade* litigation. In essence, Lumbermens chose to close its eyes and it now complains that it couldn't see. The argument really goes to a nonissue, however, because the parties agree on the material facts.

not depositing the waste in the local authority's sewage system.

During the period from November 12, 1976 to December 21, 1977, ABM disposed of industrial wastes by transporting the wastes in 55 gallon metal drums or simply by tanker truckloads.[3] One of the main dumping sites utilized by ABM was an area located at 1 Flower Street, Chester, Pennsylvania that will be referred to as the *Wade* site. Wastes brought to the *Wade* site were frequently dumped directly onto the soil from either the 55 gallon barrels or the tanker trucks. On February 2, 1978 a fire occurred at the *Wade* site. The fire lead to an investigation of the *Wade* site and ultimately to an action[4] brought by the United States government under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA).[5]

On or about July 11, 1983, Jordan was severed with an amended third party complaint joining them in the *Wade* CERCLA action. The amended third party complaint, which incorporated the terms of the third amended complaint in the action, alleged that Jordan endangered health and environment at the *Wade* site as a result of the depositing of its industrial waste at the site.

Subsequent to its joinder in the *Wade* CERCLA action, Jordan presented a claim to Lumbermens on July 19, 1983. In a letter dated August 22, 1983, Lumbermens informed Jordan that it was reserving its rights under the insurance policy pending an investigation of the case.[6] By letter dated December 28, 1983 Lumbermens advised Jordan that it was disclaiming coverage.

Jordan also presented a claim to defend and indemnify to Centennial. Centennial responded to the claim by defending the

**3.** It appears that AMB picked up waste from Jordan on the following dates and in the following amounts:

| DATE | AMOUNT | DATE | AMOUNT |
|------|--------|------|--------|
| 11/12/76 | 193 drums (10,615 gallons) | 6/3/77 | 6000 gallons |
| | | 6/10/77 | 6000 gallons |
| 2/3/77 | 56 drums (3080 gallons) | 6/28/77 | 86 drums (4730 gallons) |
| 2/16/77 | 76 drums (4180 gallons) | 7/19/77 | 80 drums (4400 gallons) |
| 5/31/77 | 6000 gallons | | |
| | | 7/20/77 | 67 drums (3685 gallons) |
| 6/1/77 | 5000 gallons | | |
| 6/2/77 | 6000 gallons | 10/26/77 | 4000 gallons |
| 6/2/77 | 6000 gallons | 11/9/77 | 4000 gallons |
| | | 12/21/77 | 6000 gallons |
| | | TOTAL: | 79,690 gallons |

See Affidavit of Franklin P. Tyson, President of ABM Disposal Service Company, dated August 9, 1983.

**4.** *United States of America v. Melvin R. Wade,* 653 F.Supp. 11 (E.D.Pa.).

**5.** 42 U.S.C. § 9601, et seq.

**6.** Lumbermens stated that it reserved its rights for the following reasons:
    1. The loss date does not appear to fall within the policy dates.
    2. Allegations in the complaint do not appear to fall within the meaning of occurrence as defined in the policy.

3. Exclusion "f" would appear to apply in this instance. Exclusion "f" states in part: to bodily injury or property damage arising out of the discharge, disposal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon [sic] land, the atmosphere or any water course or body of water, but this exclusion does not apply if such discharge, dispersal, release or escape is sudden or accidental.
4. We will not assume the defense or contribute to the costs of the defense, until our

action and ultimately settling all claims against Jordan. The settlement required Jordan to pay $94,000.00 to the Commonwealth of Pennsylvania.

Centennial and Jordan brought this declaratory judgment action requesting that the Court declare that Lumbermens was obligated to defend and indemnify Jordan against the claims raised in the *Wade* CERCLA action.[7]

## II. Standard for Summary Judgment

A trial court may enter summary judgment if, after a review of all evidentiary material in the record, there is no genuine issue as to any material facts, and the moving party is entitled to judgment as a matter of law. *Bank of America Nat. Trust and Sav. Ass'n v. Hotel Rittenhouse Associates*, 595 F.Supp. 800 (E.D.Pa.1984). Where no reasonable resolution of the conflicting evidence and inferences therefrom could result in a judgment for the non-moving party, the moving party is entitled to summary judgment. *Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879, 883 (3rd Cir.1981), *cert. denied* 454 U.S 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981).

The moving party must initially show an absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). The moving party's burden may be discharged by demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed 2d 265, 275 (1986). Once the moving party has pointed out the absence of a dispute as to a material fact, the non-moving party must go beyond its pleadings and designate specific facts by use of affidavits, depositions, admissions or answers to interrogatories

showing there is a genuine issue for trial. *Celotex*, at 324, 106 S.Ct. at 2553, 91 L.Ed. 2d at 274.

In this case, both parties have filed motions for summary judgment. Because I find that genuine issues of material fact do not exist in this case, summary judgment is appropriate where Lumbermens is entitled to recover as a matter of law.[8]

## III. Discussion

Centennial and Jordan ask this Court to declare that Lumbermens had a duty to defend and indemnify Jordan in the *Wade* CERCLA action.[9] An insurer must defend an insured whenever the complaint filed by the injured party *potentially* states a claim within the policy's coverage. *Pacific Indemnity Company v. Linn*, 766 F.2d 754, 760 (3rd Cir.1985); *C.H. Heist Caribe Corporation v. American Home Assurance Company*, 640 F.2d 479, 483 (3rd Cir.1981); *Techalloy Company Inc. v. Reliance Insurance Company*, 338 Pa.Super. 1, 8, 487 A.2d 820, 824 (1984). The factual allegations of the complaint create the duty to defend which continues until the insurer can confine the claim to a recovery that is not within the scope of the policy.[10] *Pacific Indemnity Company*, at 760.

The allegations in the third party complaint against Jordan incorporated the allegations made against the defendants/third party plaintiffs in the government's third amended complaint in the *Wade* CERCLA action. To determine whether the allegations potentially state a claim within the insurance policy coverage, various questions of insurance contract interpretation must be resolved.

### A. An Occurrence Within the Policy

Lumbermens argues that it was not required to defend or indemnify Jordan be-

investigation as to coverage has been concluded.

7. Centennial and Jordan seek an apportionment of the insurance coverage pursuant to the "other insurance" clauses of both the Lumbermens and Centennial policies.

8. "Determination of the proper coverage of an insurance contract when the facts are not in

dispute is a question of law." *Pacific Indemnity Company v. Linn*, 766 F.2d 754, 760 (3rd Cir. 1985).

9. 653 F.Supp. 11 (E.D.Pa.).

10. Because I do not find a duty to defend in this case, I will not consider the duty to indemnify.

cause property damage was not caused by an occurrence within the policy period of August 15, 1976 to August 15, 1977. Lumbermens, instead, asserts that the occurrence that caused the underlying CERCLA claim was the February 2, 1978 fire that sparked the investigation into the *Wade* site.

■ The Lumbermens insurance policy states as follows:

"Occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected or intended from the standpoint of the insured.

It seems unquestionable that an occurrence within the policy took place.[11] The general rule requires the Court to determine an occurrence by the cause or causes of the resulting injury. *Appalachian Insurance Company v. Liberty Mutual Insurance Company,* 676 F.2d 56, 61 (3rd Cir.1982). The release of toxic industrial waste onto the land at the *Wade* site caused the property damage to the land at that location. The source of the harm was the dumping of the waste. The dumping of the waste is an occurrence within the policy because it was an accident from the insured's standpoint. The facts do not indicate that Jordan expected or intended illegal and harmful dumping of its toxic waste. Jordan hired ABM Disposal Company to dispose of its toxic waste during a period of time that it could not utilize the local authority's sewage system. Jordan naturally expected and intended that ABM would legally dispose of its waste.

The more difficult question that must be resolved in determining potential insurance coverage is when the occurrence arose triggering coverage. The rule in this Circuit is

clear. "[T]he determination of when an occurrence happens must be made by reference to the time when the injurious effects of the occurrence take place." *Appalachian Insurance Company,* 676 F.2d at 61–62.[12] In *Appalachian,* and also *Riehl v. Travelers Insurance Company,* 772 F.2d 19 (3rd Cir.1985), the Court of Appeals held that the occurrence arose when the injuries first manifested themselves. *Appalachian,* 676 F.2d at 62; *Riehl,* 772 F.2d at 23. Lumbermens argues that the manifestation rule is applicable in this case, and that the injuries did not manifest themselves until the February 2, 1978 fire at the *Wade* site. Since its insurance policy expired August 23, 1977, Lumbermens claims that an occurrence did not arise during its policy period and no coverage existed.

Centennial and Jordan argue that an occurrence arose each time the toxic waste was dumped onto the *Wade* site.[13] Centennial and Jordan claim that on sixteen (16) separate occasions, between November 12, 1976 and December 21, 1977,[14] toxic wastes were released onto the *Wade* site causing property damage.

I agree with Centennial and Jordan. An occurrence arose each instance the wastes were released onto the *Wade* site. This is the time that the injurious effect took place because this is the time that the property was actually damaged. *Appalachian* and *Riehl* do not require a contrary result. These cases involved facts where the injurious effects were difficult to identify specifically in time. *Appalachian* involved a discriminatory 1965 employment policy in which the injurious effects began immediately upon its adoption in 1965 and continued until sometime in 1971. *Riehl* involved a toxic waste site where the record did not

---

**11.** *But see American States Insurance Company v. Maryland Casualty Co.,* 587 F.Supp. 1549, 1553 (E.D.Mich.1984) (where the allegations suggested that the release of toxic materials was continuous and not unintended, unexpected, sudden or by accident, an "occurrence" was not found within a similar insurance policy).

**12.** *See also, Riehl v. Travelers Insurance Company,* 772 F.2d 19, 23 (3rd Cir.1985).

**13.** Centennial and Jordan assert that the dumping dates may be inferred from the waste pick up dates listed in note 3, *supra.* This is a reasonable inference that will be drawn in their favor for the purpose of these summary judgment motions.

**14.** The following pick up/dump dates occurred during Lumbermens policy: 11/12/76; 2/3/77; 2/16/77; 5/31/77; 6/1/77; 6/2/77; 6/3/77; 6/10/77; 6/28/77; 7/19/77; 7/20/77.

disclose when the dumping commenced, occurred or when the pollution was discovered.[15] The case at bar is clearly distinguishable. The dates of the pollution releases are reasonably identifiable. Each release caused property damage and each release, consequently, constitutes an occurrence as of the date of the release and the simultaneous damage.

Both state and federal courts have recently recognized this "actual damage" approach to the trigger of coverage analysis of an occurrence-type insurance policy. *Continental Insurance Companies,* 811 F.2d 1180, 1189 (8th Cir.1987) *rehearing granted* 815 F.2d 51 (8th Cir.1987) (Environmental damage occurs at the time that hazardous wastes are improperly released into the environment); *Fireman's Fund Insurance Companies v. Ex–Cell–O Corporation,* 662 F.Supp. 71, 76 (E.D.Mich. 1987) (Each exposure of the environment to a pollutant constitutes an occurrence and triggers coverage); *Industrial Steel Container Company v. Fireman's Fund Insurance Co.,* 399 N.W.2d 156, 159 (Ct. of App.Minn.1987) (Rejects the argument that only one occurrence arises where property damage results from continuous or repeated conditions of exposure and adopts the actual injury rule).[16]

I, therefore, hold that occurrences did arise within Lumbermens' policy.

### B. The Pollution Exclusion

Lumbermens asserts that the pollution exclusion in its policy bars coverage even if the Court finds that an occurrence arose during its policy period. The language of the policy states,

[i]t is agreed that such insurance as is afforded by this policy shall not apply to ... property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, waste materials or other irritants contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*

Lumbermens argues that the continuous release of Jordan's waste onto the *Wade* site for a period of thirteen (13) months precludes a finding that the release was sudden and accidental within the exception to the pollution exclusion.[17]

Although the law regarding the interpretation of pollution exclusion clauses is less than clear in many other jurisdictions,[18] the law in Pennsylvania is well established. In *Techalloy Company, Inc. v. Reliance Insurance Company,* 338 Pa.Super. 1, 487 A.2d 820 (1984), the Pennsylvania Superior Court held that a pollution exclusion clause similar to the clause in the case at bar was unambiguous and that the language should be given its plain and ordinary meaning. *Id.* at 12–13, 487 A.2d at 826. The Court further stated that the insurance policy would not provide coverage for toxic discharge into the environment unless the discharge was both sudden and accidental. In *Techalloy,* the court held that the insurer did not have a duty to defend where the allegations in the complaint and the facts in the record did not establish a sudden event. *Id.* at 15, 487 A.2d at 827. The regular or sporadic contamination in *Techalloy* took place over a 25 year time span.

---

**15.** *See also Mraz v. Canadian Universal Insurance Company, Limited,* 804 F.2d 1325, 1328 (4th Cir.1986) (Occurrence takes place when the injuries first manifest themselves where the existence or scope of the damage remains concealed or uncertain for a period of time).

**16.** See *Industrial Steel Container Company,* 399 N.W.2d 156, 159 (Ct. of App.Minn.1987) for a nice overview of five different approaches courts utilize in deciding when damage or injury occurs.

**17.** The Governments' Third Amended Complaint alleges that continuous dumping occurred at the

*Wade* site. See Third Amended Complaint, pp. 5–7. In addition, Jordan's proof of loss, or accident notice, filed with Lumbermens, alleged eleven (11) separate occurrences arising between November 12, 1976 to July 20, 1977. *See* Plaintiff's Exhibit "V".

**18.** *See* Note, *The Pollution Exclusion Clause through the Looking Glass,* 74 Geo.L.J. 1237 (1986) (providing an excellent analysis on the history, development and current status of the pollution exclusion clause).

The interpretation of the pollution exclusion clause utilized in *Techalloy* has consistently been followed by the district courts in both the eastern and western districts of Pennsylvania. In *Fischer & Porter Company v. Liberty Mutual Insurance Company*, 656 F.Supp. 132 (E.D. Pa.1986) Judge Giles held that a pollution exclusion clause nearly identical to the clause in Lumbermens' policy was not ambiguous and the Court did not find coverage under the policy. The contamination in *Fischer* occurred when the insured's employees regularly poured chemicals into the company's floor drains and other areas thus contaminating the groundwater. The Court held that the pollution resulted from voluntary acts within the regular course of the insured's business and the disposal was not accidental. *Id.* at 139. In addition, the continuous dumping of toxic chemicals was not sudden, even if one could argue that the disposal was accidental. *Id.* at 140.

Similarly, Judge Ziegler of the western district held that a similar pollution exclusion clause barred insurance coverage in *American Mutual Liability Insurance Company v. Neville Chemical Company*, 650 F.Supp. 929 (W.D.Pa.1987). In *American Mutual*, contamination of ground water occurred at least from 1973 to 1979. The court held that the contamination was not sudden, unexpected or accidental within the terms of the policy.[19]

From these cases I conclude that the Lumbermens insurance policy does not provide coverage for the release of Jordan's industrial waste onto the *Wade* site

unless the release was sudden and accidental. The toxic releases onto the *Wade* site could be considered accidental if viewed from the standpoint of the insured. This perspective is arguably required to keep the definition of accident consistent within the policy provisions defining an occurrence and the pollution exclusion.[20] Jordan claims that it did not expect or intend that its waste would be illegally dumped by ABM at the *Wade* site. Since the determination of an accident is made from the insured's perspective, the dumping can be considered an accident within the pollution exclusion.

The record does not reveal any facts, however, that would indicate that the discharge of Jordan's waste onto the *Wade* site was sudden. *Techalloy, Fischer, American Mutual* and *American Motorists Insurance Company v. General Host Corporation*, 667 F.Supp. 1423 (D.Kansas 1987) reject the notion that a toxic discharge occurring continuously or even sporadically over a period of time may be considered sudden within the meaning of the pollution exclusion.[21] In the present case, Jordan's waste was released onto the *Wade* site on numerous occasions over a thirteen month period. This Court cannot characterize continuous activity such as this as sudden.

Centennial and Jordan contend that each release of the waste onto the *Wade* site was sudden from their point of view, and therefore the pollution exclusion should not bar coverage. This argument equates the meaning of the term accidental with the

**19.** It should be noted that the trial court granted summary judgment for the insurer after it found the pollution exclusion precluded coverage in both *Fischer*, 656 F.Supp. 132 (E.D.Pa. 1986) and *American Mutual*, 650 F.Supp. 929 (W.D.Pa.1987). *See also American Motorists Insurance Company v. General Host Corporation*, 667 F.Supp. 1423 (D.Kansas 1987) where the district court granted the insurers motion for summary judgment after finding that the pollution clause unambiguously applied to the facts, and also that the activity was not an "occurrence" within the meaning of the policy.

**20.** The policy defines an occurrence as an *accident* while it also excludes from coverage pollution releases that are *accidental* and sudden.

**21.** The Court in *American Motorists* utilized interesting interpretations of accidental and sudden. The court stated that even if the definition of accidental is subjective, thus requiring that the determination be made from the standpoint of the insured, the definition of sudden is objective. The court further stated "no use of the word 'sudden' or 'suddenly' could be consistent with an event which happened gradually or over an extended time, nor could it be consistent with an event which was anticipated or predictable." 667 F.Supp. at 1428.

definition of the term sudden. I reject this interpretation as contradictory to the plain and ordinary meaning of these terms.[22] Under the specific facts of this case, where ABM as a middleman disposed of Jordan's wastes illegally, the disposal could be accidental from Jordan's perspective, but I can not find that the release was sudden due to its continuous nature. This interpretation prevents companies, whose wastes are regularly disposed of improperly, from hiding behind their ignorance and seeking insurance for damages caused by pollution that occurs in the regular course of business. Companies should avoid improper toxic waste disposal rather than blindly accept it as a cost of doing business.

I therefore hold that the continuous nature of the toxic waste disposal precludes coverage under the Lumbermens policy because the pollution was not sudden within the exception to the pollution exclusion in the policy.

### C. Damages or Equitable Relief

Finally, Lumbermens contends that its policy does not provide coverage in the present case because the underlying CERCLA action sought equitable relief rather than legal damages. The policy provides that "the company will pay on behalf of the insured all sums which the insured becomes legally obligated to pay as *damages* ... because of bodily injury or property damage...."

Courts that have considered this issue have come to contradictory conclusions. The United States Court of Appeals for the Fourth Circuit, in *The Maryland Casualty Company v. Armco, Inc.*, 822 F.2d 1348 (4th Cir.1987), held that the term "damages" should be given its legal, technical meaning and that relief requested pursuant to CERCLA § 107(a) is equitable and remedial in nature and not within the coverage of an insurance policy similar to the policy in the case at bar. *Id.* at 1352. The court distinguished between "damages", which compensate a loss with a sum of money, and "restitution" which reimburse a party for restoring the status quo. The court held that investigative and remedial action taken by the government respecting potential environmental hazards constituted prophylactic measures to prevent future harm, and the cost of the action was not compensable under the insurance policy in that case. *Id.* at 1353–4.

On the other hand, most of the courts that have considered this issue have held that "damages" include the costs of cleaning up environmental contamination. *See Continental Insurance Companies v. Northeastern Pharmaceutical and Chemical*, 811 F.2d 1180 (8th Cir.1987) (clean-up costs under CERCLA are compensable damages within a comprehensive general liability policy); *Township of Gloucester v. Maryland Casualty Company*, 668 F.Supp. 394 (D.N.J.1987) (clean-up and closure costs are "damages" under the comprehensive general liability policy); *Fireman's Fund Insurance Companies v. Ex–Cell–O Corporation*, 662 F.Supp. 71 (E.D. Mich.1987) ("damages" includes money spent to clean up environmental contamination); *United States Aviex Company v. Travelers Insurance Co.*, 125 Mich.App. 579, 336 N.W.2d 838 (1983) ("damages" included sums expended to comply with clean up order).

The cases allowing environmental clean up costs as damages within insurance policies recognize that the government frequently has a choice whether to seek an injunction ordering a party to clean up a

---

**22.** I refuse to ignore the conjunctive "and" between sudden *and* accidental in the pollution exclusion clause as many courts have done. *See Pepper's Steel & Alloys, Inc. v. United States Fidelity and Guaranty Company*, 668 F.Supp. 1541 (S.D.Fla.1987) (the decisive inquiry is whether the pollutants entered the environment unexpectedly and unintentionally); *Fireman's Fund Insurance Companies v. Ex–Cell–O Corporation*, 662 F.Supp. 71 (E.D.Mich.1987) (release must be unexpected and unintended to fall outside the exclusion). *Buckeye Union Insurance Co. v. Liberty Solvents and Chemicals Co., Inc.*, 17 Ohio App.3d 127, 477 N.E.2d 1227 (1984) (exclusion does not apply where damages are unexpected and unintended); *Jackson Township Municipal Utilities Authority v. Hartford Accident and Indemnity Company*, 186 N.J.Super 156, 451 A.2d 990 (Law.Division 1982) (the policy will cover claims where the injury was neither expected nor intended).

contaminated site or to clean up the site itself and subsequently sue for the costs expended in toxic waste cases.[23] In *United States Aviex*, the Court of Appeals of Michigan held that "damages" includes clean up costs whether they are directly sought or pursued by an injunction. The Court stated,

> It is merely fortuitous ... that the state has chosen to have plaintiff remedy the contamination problem, rather than choosing to incur the costs of clean-up itself and then suing plaintiff to recover those costs.

*Id.* at 590, 336 N.W.2d at 843.

This reasoning was adopted in *Township of Gloucester* and *Fireman's Fund* as well. When such an option exists, coverage should not hinge on the form of action taken or the nature of the relief sought. Coverage should be triggered when an actual or threatened use of the legal process coerces payment or clean up conduct by a policyholder. *Fireman's Fund*, 662 F.Supp. at 75.

Lumbermens refers the Court to *U.S. v. Price*, 688 F.2d 204 (3rd Cir.1982) which held that an injunction ordering funding for a diagnostic study on contamination clean up was equitable in nature even though it required the payment of money. This case does not demand a particular result in the case at bar because it did not address the issue of insurance coverage for equitable relief. I find the reasoning of the courts that have held clean up costs recoverable as "damages" sound. Even if the action is preventative or equitable in nature, the costs incurred in cleaning up property damage from toxic contamination are damages within a comprehensive general liability insurance policy. Unlike the reasoning utilized in *Mary-*

*land Casualty Company*, Pennsylvania courts have traditionally recognized the insurability of preventative measures. *Leebov v. United States Fidelity and Guaranty Company*, 401 Pa. 477, 165 A.2d 82 (1960); *Lehigh Electric & Engineering Co. v. Selected Risks Insurance Co.*, 30 Pa. D & C3d 120 (Luzerne Co. 1982); *Aronson Associates, Inc. v. Pennsylvania National Mutual Casualty Insurance Company*, 14 Pa. D & C.3d 1 (Dauphin Co. 1977). It is in everyone's best interest that toxic waste contamination be prevented in the first place and promptly cleaned up if it is allowed to occur.

I therefore hold that the Lumbermens policy would provide coverage for the clean up costs sought in the underlying *Wade* CERCLA action if the coverage was not barred by the pollution exclusion.

## IV. *Conclusion*

I have found that the facts are not disputed in this case. The only questions of law involve insurance contract interpretation. This case is therefore appropriate for summary judgment. Although I found "occurrences" during the Lumbermens policy period which resulted in "damages" recoverable under the policy, judgment will be entered in favor of Lumbermens in this case because the pollution exclusion clause in its policy bars coverage for continuous toxic waste disposal.

An appropriate Order follows.

### ORDER

AND NOW, this 17th day of November, 1987, it is hereby Ordered, in accordance with the foregoing memorandum, that judgment is entered in defendant Lumbermens Mutual Casualty Company's favor

---

**23.** The language of section 107 of CERCLA provides:

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or site selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and

(C) damages for injury to destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release.

42 U.S.C. § 9607(a)(4).

and judgment is entered against plaintiffs Centennial Insurance Company and Jordan Chemical Company.

AND IT IS SO ORDERED.